# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION


IN RE:

**GREGORY DONALD DAVIS**                    BK 00-73045-CMS-13

    **DEBTOR**

**DAN M. GIBSON, AS ADMINISTRATOR**          AP 05-70041-CMS
**OF THE DECEDENT ESTATE OF**
**GREGORY D. DAVIS**

    **PLAINTIFF**

v.

**GREGORY J. KING**

    **DEFENDANT**

## <u>MEMORANDUM OF DECISION</u>

This matter came before the court on Complaint for Declaratory Judgment (AP Doc. 1) against Gregory J. King ("King") filed by Gregory D. Davis ("Davis") and Counter-claim (AP Doc. 20, amended by AP Doc. 21) filed by King against Dan M. Gibson as Administrator of the Decedent Estate of Gregory D. Davis. The original declaratory judgment action by Davis asked the court to determine that a certain Buy-Sell Agreement was no longer in existence and/or was unenforceable and invalid. King's Counterclaim asserted that the Buy-Sell Agreement was still in force and effect and asked the court to value stock certificates in DePalma's Italian Cafes of Tuscaloosa, Inc. pursuant to the terms of the Buy-Sell Agreement. The matter was set for trial at which time the parties agreed that the issues in controversy would be bifurcated and the court would first determine

1

whether or not the Buy-Sell Agreement was still in effect. The parties submitted the deposition of Gregory J. King (Plaintiff's Exhibit 1) and all exhibits to the King deposition. The issue to be decided by this Court is whether the Buy-Sell Agreement executed by DePalma's Italian Cafes of Tuscaloosa, Inc. and its original shareholders is valid and enforceable. The Court finds that the Buy-Sell Agreement is valid and enforceable.

## FINDING OF FACTS

DePalma's Italian Cafes of Tuscaloosa, Inc. (the "Corporation") was originally incorporated on September 27, 1994 (Plaintiff's Exhibits 3 and 4). The original shareholders were Gregory D. Davis ("Davis") and Howard Tate Scott ("Scott"). Davis owned 700 voting shares and 1,200 non-voting shares, and Scott owned 100 voting shares. Davis was appointed President and Secretary/Treasurer of the Corporation. On September 2, 1994, the Corporation, Davis, and Scott executed the Buy-Sell Agreement at issue in this case (Plaintiff's Exhibit 8). The Agreement became effective on September 27, 1994.

The following are some, but not all, provisions in the Buy-Sell Agreement relevant to the Court's resolution of the issues presented:

The Agreement provided for option events.

**ARTICLE I**
DEFINITIONS

(24) "Option Event" or "Option Events": A Consensual Transfer, a Non-Consensual Transfer, the death of a Shareholder, Disability of a Shareholder, Termination of Employment of a Shareholder, or S Election Termination, or a Control Offer to the extent described herein.

Article II of the Agreement provided in part as follows:

2

## ARTICLE II
LIFETIME OPTIONS

(1) RESTRICTIONS ON SHARES: Each Shareholder hereby grants to the Optionee Shareholders and the Corporation the continuing option to purchase all his Shares that become Option Shares due to the occurrence of any Option Event, on the terms, conditions, and limitations contained herein.

(2) FIRST OPTION: Upon the occurrence of the Option Event, the Optionee Shareholders shall have the First Option to purchase all the Option Shares at the Purchase Price and on the terms, conditions, and limitations hereinafter stated.

(3) FIRST OPTION METHOD: The Purchasing Shareholders shall have the right to purchase the Option Shares in proportion to their ownership of the remaining Shares. Any Optionee Shareholder may exercise his option to purchase Option Shares in part or in whole, and the other Optionee Shareholders shall be authorized to purchase any Option Shares that any Optionee Shareholder elects not to purchase in proportion to their ownership of the remaining Shares.

The Agreement also provided in Article V as follows:

## ARTICLE V
ADMINISTRATIVE PROVISIONS

(2) SHARES CERTIFICATES: Each certificate for Shares subject to this Agreement shall bear a restrictive legend substantially similar to the following:
THE SALE OR TRANSFER OF THIS SECURITY IS SUBJECT TO CERTAIN RESTRICTIONS (INCLUDING, BUT NOT LIMITED TO, POSSIBLE RESTRICTIONS RELATING TO EXERCISE OF VOTING RIGHTS) SET FORTH IN THE ARTICLES OF INCORPORATION AND/OR WRITTEN AGREEMENTS, COPIES OF WHICH MAY BE OBTAINED FROM THE SECRETARY OF THE CORPORATION.

(6) TERMINATION:
(a) GENERAL: This Agreement shall terminate upon the occurrence of any of the following events:
(i) LIQUIDATION: The liquidation and dissolution of the Corporation.
(ii) AGREEMENT: The written agreement of all the Shareholders to terminate this Agreement.
(iii) DEATH OF ALL SHAREHOLDERS: The deaths of all Shareholders within a thirty-day period.

3

(iv) ONE SHAREHOLDER: The acquisition of all Shares by one person.

(7) PARTIES NOT TO CONTRAVENE AGREEMENT: No shareholder shall make any agreement or contract with others that would or might alter, rescind, or abrogate the provisions hereof, nor shall any Shareholder make any will, gift, or other testamentary or inter vivos disposition in contravention of this Agreement.

(a) VIOLATION: If a Shareholder violates the terms of this Agreement, the Corporation and the other Shareholders each shall have the right to compel the holder or transferee of the Shareholder's Shares to redeliver such Shares to such Shareholder to be held in accordance with this Agreement. No purported transfer in violation of this Agreement shall be recognized for any purpose and will not affect the beneficial ownership of the Shares. Such purported transfer shall be null, void, and held for naught, as if never made.

(8) FUTURE SHAREHOLDERS: The parties contemplate that there may be additional shareholders of the Corporation in the future. The Corporation shall issue no Shares, except to the parties (which Shares shall immediately become subject to this Agreement), until this Agreement is amended to provide for the inclusion of any such shareholder as a party to this Agreement. The Shareholders hereby constitute and appoint the president of the Corporation, as from time to time elected, and his successors in office, as their true and lawful attorney in fact for the purpose of so amending this Agreement and executing such amendments in the name of all the parties.

(19) MISCELLANEOUS:

(c) AMENDMENT IN WRITING: This Agreement may not be amended, modified, altered, changed, terminated, or waived in any respect whatsoever, except by a further agreement in writing, properly executed by all of the parties.

(e) BINDING EFFECT: This Agreement shall bind the parties and their respective personal representatives, heirs, next of kin, legatees, distributees, successors, and assigns.

(r) WAIVER OF DEFAULT: No waiver by any party hereto of any default, breach, or violation of any term, condition, or provision of this Agreement shall be deemed to be a waiver of any other default, breach, or violation of the same or any other term, condition, or provision contained herein.

(s) DELAY OR OMISSION NOT WAIVER: No delay in exercising or failure to exercise any right or remedy by any party shall impair any such right or remedy or constitute a waiver of any such right, remedy, or default, breach or violation of any term, condition, or provision of this Agreement or an acquiescence therein. Every right and remedy given by this Agreement or by law to a party may be exercised from time to time and as often as deemed expedient by a party.

4

The original stock certificate issued to Davis at the time of incorporation contained the following language: "The sale, transfer, or other disposition of these shares is restricted pursuant to the provisions of a letter agreement dated _____, from the registered holder to the transferors, a copy of which may be examined at the office of the Company." (Plaintiff's Exhibit 9). This stock certificate was signed by Davis, as secretary and president of the corporation. Plaintiff's Exhibit 6 is a copy of the original stock certificate of Scott, but does not include a copy of the back of the certificate. This legend on the original certificate issued by the corporation varies from the legend required by Article V (2) of the Buy-Sell Agreement, even though it appears from Exhibit 10 that the original stock certificate to Davis was issued the same date that the Buy-Sell Agreement was effective.

Approximately six months after the original incorporation, on March 10, 1995, Davis transferred 100 of his voting shares to Scott (Plaintiff's Exhibits 10 and 11). This transfer left Davis with 600 voting shares and gave Scott 200 voting shares. The stock certificates issued pursuant to this transaction contained the following language on the front of the certificate, "The sale or transfer of this security is subject to certain restrictions (including, but not limited to, possible restrictions relating to exercise of voting rights) set forth in the Articles of Incorporation and/or written agreements, copies of which may be obtained from the secretary of the corporation." This is an exact copy of the language included in Article V, paragraph 2 of the Buy-Sell Agreement. The restrictions on transfer of stock referenced on this stock certificate was not in the Articles of Incorporation, but in the written Agreement between Davis, Scott, and the Corporation.

At this time, on March 10, 1995, there was no evidence that Davis, Scott, or the Corporation intended to abandon or rescind the Buy-Sell Agreement. The restriction on the stock certificates

5

came directly from the Buy-Sell Agreement. The restrictive legend on the front of the stock certificate was not a written amendment to the September 27, 1994, Buy-Sell Agreement.

Approximately one year after the original incorporation, on September 19, 1995, a special meeting of the Corporation was held in which 1,200 non-voting shares were converted to voting shares, resulting in the following distribution of shares: Davis owned 1,200 shares (60%), Scott owned 200 shares (10%), King owned 300 shares (15%), and Ashby G. Lawson owned 300 shares (15%) (Plaintiff's Exhibit 12). There was no mention in the minutes of the special meeting that the original agreement was being modified or cancelled; nor was there any mention made of any restriction on the transfer of these new shares in the minutes of the special meeting. The stock certificates issued in accordance with this transfer contained the following language:

> The shares represented by this certificate and any transfer of the share are subject to all of the terms and provisions of the bylaws of DePalma's Italian Cafes of Tuscaloosa, Inc., providing in substance that any shareholder desiring to sell or transfer any of his or its shares must first offer those shares to the corporation and then to the other shareholders in a specific manner before selling or otherwise disposing of them to a nonshareholder. A copy of the bylaws may be inspected by the holder of this certificate at the principal office of the corporation. (Plaintiff's Exhibit 13)

All these certificates were signed by Davis, as secretary and president. Plaintiff's Exhibit 3 is a copy of the By-Laws of the corporation. Article VI (1) and (2) provide that stock certificates are to be issued by the corporation and signed by the president or vice president and the secretary or treasurer. Davis held both the offices of president and secretary/treasurer at all times prior to his death. The restrictions on the back of all the certificates referred to restrictions contained in the By-Laws of the corporation, but in fact there were no restrictions in the By-Laws, only restrictions in the Buy-Sell Agreement. If this restrictive endorsement evidenced the fact that the parties intended

6

that the shares in DePalma's be subject to a transfer restriction, the only evidence of such a restriction is the September, 1994, Buy-Sell Agreement. While this restrictive endorsement was on the shares issued in King's name, he testified that he did not actually receive this stock certificate and did not remember having seen the stock certificate (Plaintiff's Exhibit 1 at pages 39-40). King testified that he knew there was a Buy-Sell agreement because it was discussed by Ashby Lawson, Greg Davis, and Steve Stephens, an insurance agent, when they were discussing the corporation purchasing life insurance on the shareholders in order to fund the purchase of shares in the event of the death of one of the shareholders (Plaintiff's Exhibit 1 at pages 51-52). King further testified that he did not see the Buy-Sell Agreement at issue until July, 2002, some seven years after he first became a shareholder (Plaintiff's Exhibit 1 at page 17).

Four years after incorporation, on December 31, 1998, a Bill of Sale of Stock was executed in which Scott agreed to sell one-half of his shares to King (Plaintiff's Exhibit 15). Included in the Bill of Sale was a paragraph setting out that, "[s]eller warrants and represents that it has good title to said property, full authority to sell and transfer same and that said goods and chattels are being sold free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description." Davis was a witness to this agreement which was executed by Scott and King.

Also executed in conjunction with this Bill of Sale was a Promissory Note and Pledge of Shares of Stock, which were also witnessed by Davis (Plaintiff's Exhibit 15). Included in the Pledge of Stock was the provision, "the Pledgor understands that upon foreclosure the pledged shares may be sold at public auction or private sale." Article II, paragraph 8(b) sets out provisions related to the purchase of option shares. It provides:

> (b) COLLATERAL: Such promissory note shall be secured by a pledge of

7

and security interest in the Option Shares under the Alabama Uniform Commercial Code as then in effect, which pledge shall be subordinate to any then pledge of the Option Shares securing the Funded Debt of the Corporation and shall be in a form determined by the board of directors of the Corporation in their absolute discretion.

The record does not indicate that this form was approved by the board of directors, but it was executed by both Davis and Scott, the only officers and directors of the corporation.

On July 15, 2000, an agreement to purchase stock was entered into (Plaintiff's Exhibit 16). Ashby Lawson agreed to sell to King his interest in DePalma's. This agreement made reference to his previous purchase of stock from Scott. On this same date, a General Agreement was executed between all four shareholders: Lawson, King, Davis, and Scott (Plaintiff's Exhibit 16). They acknowledged that the result of this transfer would result in King owning 40% of the stock and Davis owning 60%. This General Agreement was executed by all four shareholders and provided "this agreement shall be binding upon the parties, their successors, assigns and personal representatives..." Davis witnessed the Pledge of Shares of Stock which accompanied the stock sale. Included in the pledge was the provision, "the Pledgor understands that upon foreclosure the pledged shares may be sold at public auction or private sale." This pledge was witnessed by Davis.

Since the Buy-Sell Agreement was executed on September 2, 1994, there has been no direct reference to it by the parties, nor has there been strict compliance with its terms. Scott and Davis did use the restrictive endorsement called for under the Buy-Sell Agreement when Davis transferred one hundred shares to Scott on March 10, 1995. It appears that on July 15, 2000, the four shareholders mutually agreed that whatever had transpired prior to that date resulted in 40% of shares being owned by King and 60% of the shares being owned by Davis. However, at that time, no party made mention of the Buy-Sell Agreement, nor did they agree to alter, modify, or terminate the

8

Agreement. Again, no reference was made to transfers by them in the future. No copies of any stock certificates issued as a result of this final transfer of shares were included in the exhibits. King testified that he did not receive a stock certificate as a result of this transfer (Plaintiff's Exhibit 1 at page 61). Article VI of the corporate By-Laws placed the duty on Davis to issue stock certificates after this transaction.

Greg Davis filed his Chapter 13 bankruptcy petition on December 4, 2000.

King left employment of DePalma's in February of 2002, which he described as follows:

Q. And did you say there came a time when he fired you?
A. Yes.
Q. When did he fire you?
A. Well, he never said you are fired. He just told me to give me – pardon me, he told me for me to give him his keys.

(Plaintiff's Exhibit 1 at page 26)

Greg Davis died on December 21, 2003 (Plaintiff's Exhibit 1 at page 62). On February 25, 2004, a letter was written to Attorney D. W. Wilson on behalf of King advising of his desire to exercise his option to purchase the shares of Davis pursuant to the Buy-Sell Agreement (Plaintiff's Exhibit 18). On April 14, 2004, Dan Gibson, administrator of the estate of Greg Davis, replied to the offer to purchase and asserted that King was not a party to the Buy-Sell Agreement (Plaintiff's Exhibit 19).

**CONCLUSIONS OF LAW**

This court has jurisdiction of Gregory Donald Davis' Chapter 13 case pursuant to 28 U.S.C. Section 1334(a). The court has jurisdiction of this adversary proceeding, a core bankruptcy proceeding, pursuant to 28 U.S.C. Section 157(b), under 28 U.S.C. Section 1334(b). Jurisdiction is referred to this bankruptcy court under 28 U.S.C. Section 157(a) by the General Order of

9

Reference of the United States District Courts for the Northern District of Alabama signed July 16, 1984, as amended July 17, 1984.

Davis asserts that King has no rights under the Buy-Sell Agreement because:

1. King is not a party to the Buy-Sell Agreement.

2. The Buy-Sell Agreement has been terminated, abandoned, or rescinded.

3. King is equitably estopped from asserting any rights under the Buy-Sell Agreement.

**King is bound by the Buy-Sell Agreement**.

It is without dispute that King was not a party to the original execution of the Buy-Sell Agreement of September 27, 1994. It is also not disputed that approximately one year later, September 19, 1995, by special meeting of the corporation, twelve hundred non-voting shares were converted to voting shares of which King received 300 shares and Ashby Lawson received 300 shares. This was agreed to by Davis and Scott, parties to the original agreement and sole shareholders and officers of the corporation at the time of the special meeting. It was King's testimony that he moved to Tuscaloosa from Georgia to help Davis remodel the building and start DePalma's with the promise that he would be a part owner in DePalma's (Plaintiff's Exhibit 1 at page 12).

Article V, Paragraph 8 provided for future shareholders and noted that future shareholders were contemplated. It provides:

> (8) FUTURE SHAREHOLDERS: The parties contemplate that there may be additional shareholders of the Corporation in the future. The Corporation shall issue no Shares, except to the parties (which Shares shall immediately become subject to this Agreement), until this Agreement is amended to provide for <u>the inclusion of any such shareholder as a party to this Agreement</u>. The Shareholders hereby constitute and appoint the president of the Corporation, as from time to time elected, and his successors in office, as their true and lawful attorney in fact for the purpose of so

Case 05-70041-CMS    Doc 56    Filed 02/11/08    Entered 02/11/08 15:01:29    Desc Main
Document      Page 10 of 24

amending this Agreement and executing such amendments in the name of all the parties. (Emphasis added)

Davis was both president and secretary/treasurer of the corporation at the time the new stocks were issued and the new shareholders came into existence. There is no evidence that he complied with his duty set out in Article V, Paragraph 8 of the Buy-Sell Agreement and the corporation's By-Laws.

Subsequent to the issuance of the new shares in 1995, there were transfers between Scott, King, and Lawson which ultimately resulted in Davis still owning the 1,200 shares (60%) arising out of the special meeting of the corporation in 1995, and King owning 800 shares (40%). On July 15, 2000 all four shareholders, Lawson, King, Davis, and Scott, executed Plaintiff's Exhibit 16 acknowledging that this was now an accurate reflection of the ownership of the corporation. Plaintiff's Exhibit 16 provided, "[t]his agreement shall be binding upon the parties, their successors, assigns and personal representatives ...." Davis remained president and secretary/treasurer of the corporation at the time this agreement was executed.

Article II of the Buy-Sell Agreement deals with lifetime options to existing shareholders and the corporation. In paragraph 5, if the option is not exercised by the shareholders or the corporation, "[a]ny sale, transfer, or other disposition of the Option Shares in accordance herewith shall be subject to the express condition precedent that the transferee(s) <u>shall become a party</u> to and execute this Agreement. In <u>all</u> events, any such transferee shall take and hold the Option Shares subject to the terms, conditions, and limitations of this Agreement, as amended from time to time." (Emphasis added).

Page 1 of the Buy-Sell Agreement sets out the purpose for entering into the agreement. It

11

provides, "WHEREAS, the Shareholders agree that the success of the Corporation requires their active interest and support and that it is reasonable to prevent the introduction of persons who are not willing and able to contribute in like manner to the success of the Corporation into ownership by restricting the ownership of the Shares, ...." This is in fact what transpired. The entry and exit of shareholders was agreed to by all existing shareholders and all were active participants in the corporation. King was a chef and manager of DePalma's restaurant.

Taking the Buy-Sell Agreement as a whole, it is clear that the original incorporators, shareholders, and officers anticipated admitting new shareholders into the corporation and had every intention that these new shareholders would be bound by the terms of the Buy-Sell Agreement. The duty to insure this was on the president, Davis. Article II, Paragraph 5 provided that even if this did not occur, the new shareholders would be bound by the terms and conditions of the Agreement. Plaintiff's Exhibit 13, a copy of the stock certificates issued by Davis on behalf of the corporation after the special shareholder meeting of September 19, 1995, evidenced an intention that the stocks issued would be restricted. This Buy-Sell Agreement is the only restriction in evidence.

When the original Buy-Sell Agreement was executed in September of 1994, it was anticipated that there would be future shareholders. Greg Davis was the president and secretary of the corporation and therefore it was his responsibility to issue share certificates and to ensure that new shareholders were subject to the Buy-Sell Agreement. Even though Davis failed in this duty, in accordance with Article II, Paragraph 5, new shareholders, such as King, are bound by the terms and conditions of the Agreement.

### The Buy-Sell Agreement was never terminated, abandoned or rescinded.

The Agreement clearly sets out the actions necessary to alter, amend, modify, or terminate

the Agreement. At no time were such actions taken by any shareholder or the Corporation itself. Further, the Agreement clearly sets out that failure to follow terms of the Agreement does not nullify said terms and that they will remain enforceable. A contract cannot be modified or rescinded without the consent, mutual agreement, and meeting of the minds of the parties. To "rescind a contract...the minds of the parties thereto must meet in an agreement or mutual release fully settling all rights under the contract." San-Ann Service, Inc. v. Bedingfield, 305 So. 2d 374, 377 (Ala. 1974); See also Matthews v. S.A. Martin & Martin Motors, 394 So. 2d 943 (Ala. 1981).

When the original stock certificates were issued in September, 1994, the certificates contained a restrictive legend referencing a "letter agreement dated _____, from the registered holder to the transferors ...." Approximately six months later 100 shares of Davis' stock were transferred to Scott (Plaintiff's Exhibits 10 and 11). The restrictive legend on this stock certificate stated, "[t]he sale or transfer of this security is subject to certain restrictions (including, but not limited to, possible restrictions relating to exercise of voting rights) set forth in the Articles of Incorporation and/or written agreements, copies of which may be obtained from the secretary of the Corporation." This language was taken word for word from Article V, paragraph 2 of the Buy-Sell Agreement. There were no restrictions in the Articles of Incorporation and the only written agreement restricting transfer was the original September 27, 1994, Buy-Sell Agreement.

The next transfer of stock certificates was September 19, 1995. Prior to that date there is no evidence that the original parties to the Agreement, Davis, Scott, and the Corporation, entered into any written modifications of the original Agreement, or that they intended to rescind or modify the terms of the original Agreement. On September 19, 1995, new shareholders were admitted to the corporation as contemplated by the original Buy-Sell Agreement. The new shares issued by Davis

13

on behalf of the corporation contained a restriction on transfer which provided:

> The shares represented by this certificate and any transfer of the share are subject to all the terms and provisions of the bylaws of DePalma's Italian Cafes of Tuscaloosa, Inc., providing in substance that any shareholder desiring to sell or transfer any of his or its shares must first offer those shares to the corporation and then to the other shareholders in a specific manner before selling or otherwise disposing of them to a nonshareholder. A copy of the bylaws may be inspected by the holder of this certificate at the principal office of the corporation. (Plaintiff's Exhibit 13)

This restrictive legend refers to restrictions in the By-Laws of the corporation, but the only evidence of any restrictions are those of the original Buy-Sell Agreement of September 27, 1994. The restrictive legends progressed from the original language "pursuant to provisions of a letter agreement" to "set forth in the Articles of Incorporation and/or written agreements" to "provisions of the By-Laws." The September 19, 1995, restriction also summarized the restriction as requiring first an offer to the corporation and then to the other shareholders, when in fact the Buy-Sell Agreement provided for first an option to other shareholders, then the corporation. Pursuant to the Agreement, it was Davis' duty to ensure the restriction on the stock and to ensure that the new shareholders were subject to these restrictions.

Pursuant to the Buy-Sell Agreement it would terminate by its own terms as follows:

**ARTICLE V**
ADMINISTRATIVE PROVISIONS

(6) TERMINATION:

(a) GENERAL: This Agreement shall terminate upon the occurrence of any of the following events:
(i) LIQUIDATION: The liquidation and dissolution of the Corporation.
(ii) AGREEMENT: The written agreement of all the Shareholders to terminate this Agreement.
(iii) DEATH OF ALL SHAREHOLDERS: The deaths of all Shareholders within a thirty-day period.

14

(iv) ONE SHAREHOLDER: The acquisition of all the Shares by one person.

None of the elements called for under Article V, section 6 to terminate the agreement occurred prior to September 19, 1995, when King became a shareholder. Article V, paragraph 19 of the Agreement provided that amendments shall be in writing and provided:

> (c) AMENDMENT IN WRITING: This Agreement may not be amended, modified, altered, changed, terminated, or waived in any respect whatsoever, except by a further agreement in writing, properly executed by all of the parties.

There are no written amendments to the original Agreement in evidence. Therefore, the original Agreement has neither been terminated nor amended pursuant to the terms of the Agreement.

From the facts provided, it does not appear that the parties in this case ever had a meeting of the minds or a mutual agreement to terminate or modify the original Buy-Sell Agreement. The parties never made a mutual release in which they fully settled all rights under the contract. The evidence is that King was aware at some point that there was a Buy-Sell Agreement, but did not know the terms of the Agreement until July, 2002, when he received a copy of the Agreement. There is no evidence of action taken by him before that date which could constitute an assent to the termination of the Agreement. There is no evidence that the original Buy-Sell Agreement had been modified or terminated by Davis, Scott, and the Corporation prior to September 19, 1995, when King first became a shareholder in the corporation.

Further, this Court finds that the Buy-Sell Agreement was not abandoned by the parties. "A contract will be treated as abandoned or rescinded where the acts and conduct of one party inconsistent with its existence are acquiesced in by the other party." Humphreys v. Laile, 398 So. 2d 703, 705 (Ala. Civ. App. 1981); See also Matthews, 394 So. 2d at 944; San-Ann Service, Inc.,

15

305 So. 2d at 377; <u>Henderson v. Winkler</u>, 454 So. 2d 1358, 1361 (Ala. 1984). Abandonment of a contract can be inferred by all the circumstances surrounding the conduct of the parties; therefore, the party acquiescing does not have to do so by an "explicit statement." <u>Matthews</u>, 394 So. 2d at 944. However, this abandonment or recision can only be found "when such acts and conduct of the one and the acquiescence of the other are found by the trier of facts to be positive and unequivocal." <u>San-Ann Service, Inc.</u>, 305 So. 2d at 377; <u>Matthews</u>, 394 So. 2d at 944.

This court finds that the actions of the Corporation and its shareholders were not positive and unequivocal acts of abandonment or recision of the Buy-Sell Agreement. It is true that the parties have not followed the Agreement pursuant to its specific terms. However, the clear intention of the Buy-Sell Agreement was to allow the original shareholders to control any future shareholders that might come into this small corporation. Every transfer that occurred from the very beginning was agreed to by all current shareholders. No transfers or issuance of shares occurred in violation of the intention of the Buy-Sell Agreement.

However, by the Agreement's own terms, failure to abide by or enforce a provision, or delay in exercising a right or remedy, does not destroy the right to enforce the same provision in the future.

Article V, paragraph 19(r) and (s) provide:

(r) WAIVER OF DEFAULT: No waiver by any party hereto of any default, breach, or violation of any term, condition, or provision of this Agreement shall be deemed to be a waiver of any other default, breach, or violation of the same or any other term, condition, or provision contained herein.

(s) DELAY OR OMISSION NOT WAIVER: No delay in exercising or failure to exercise any right or remedy by any party shall impair any such right or remedy or constitute a waiver of any such right, remedy, or default, breach, or violation of any term, condition, or provision of this Agreement or an acquiescence therein. Every right and remedy given by this Agreement or by law to a party may be exercised from time to time and as often as deemed expedient by a party.

16

No facts have been presented that show that the parties, either the original shareholders or subsequent shareholders, unequivocally acquiesced to the termination of the Agreement.

Moreover, each time stock was sold, transferred, or issued, some type of restrictive language was included on the certificate. Each time it was different or referred to different agreements such as a "letter agreement," "Articles of Incorporation and/or written agreements," and "the bylaws." While none of these restrictions which were placed on the certificates directly mention the Buy-Sell Agreement or adequately explain the provisions of the Agreement, they do show an intent to restrict the sale or transfer of the Corporation's stock. Pursuant to Davis' obligations as president and secretary/treasurer of the corporation, as well as the original Agreement of 1994, it was Davis' duty to insure that the stock of future shareholders was subject to the original Agreement. The exhibits submitted by the parties show stock certificates issued on three different occasions. These exhibits show that the restrictive endorsement on the first and third issuance of stock certificates did not use the restrictive endorsement called for in the Buy-Sell Agreement. The second issuance of stock certificates did use the exact restrictive language called for in the Agreement. All three times that stock certificates were issued the certificates included restrictive endorsements evidencing that they meant to restrict the transfer of shares and therefore did not unequivocally abandon the Agreement.

Reviewing each transfer of stock, this Court can find no evidence that the parties, at any time, made a written amendment to the Buy-Sell Agreement or took positive and unequivocal actions that could be deemed abandonment of the original Agreement. During the March 10, 1995, transfer, Davis simply transferred 100 of his voting shares to Scott. The stock certificates issued on March 10, 1995, contained restrictive language mentioning the Articles of Incorporation and/or written agreements which were exactly the same as provided in the Buy-Sell Agreement. Rather than

17

evidencing an intention to alter, amend or rescind the agreement, this verbatim use of the Agreement's language on the stock certificates indicates that Davis and Scott intended for the Agreement to be in effect. Therefore, in the March 10, 1995, transfer, neither Davis, Scott, nor the Corporation amended the Agreement in writing, nor did they take positive or unequivocal actions that could be seen as abandonment of the Agreement. Thus, the Agreement remained enforceable and in full effect.

For the first time since the Corporation was created shareholders, other than the original shareholders, purchased shares on September 19, 1995. This was only six months after the March 10, 1995, validation that the Buy-Sell Agreement was still in effect. At this point, King and Lawson each purchased 300 shares. The stock certificates contained restrictive language referencing the by-laws of the Corporation. This court finds that the reference to by-laws instead of the Buy-Sell Agreement, while incorrect, was not meant to be an amendment to the Agreement. The parties have shown no evidence that any written amendment to the Agreement was made during the September 19, 1995, transfer of stock. Further, the parties have failed to show that the allowance of King and Lawson to purchase shares was a positive or unequivocal action which abandoned or rescinded the Agreement. Both Davis and Scott assented to the addition of King and Lawson as shareholders. While the transfer was not in strict compliance with the Agreement, the Agreement itself contains language which states that failure to follow a provision once does not abrogate the duty to follow it in the future. Therefore, this court finds that allowing King and Lawson to purchase stock without following the procedures laid out in the Agreement was not an affirmative action to abandon the Agreement. The Agreement was still enforceable against all parties, including the new shareholders.

The next transfer of stock came on December 31, 1998, when Scott agreed to sell one-half

18

of his shares to King through a Bill of Sale of Stock, a Promissory Note,  and a Pledge of Shares of Stock.  Scott and King executed all documents evidencing the transfer, and Davis witnessed all said documents.  Therefore, the parties were aware of the transfer and assented to it.  This court finds that none of the documents executed on December 31, 1998, were written amendments to the original Agreement, and no action taken by the parties was intended to amend, rescind, or abandon the Agreement.  Therefore, the Buy-Sell Agreement remained enforceable against all parties.

The next transaction was on July 15, 2000, in which Lawson agreed to sell his stock to King.  This agreement made mention that Lawson had previously purchased stock from Scott; however, the parties have not produced any documents evidencing the transfer from Scott to Lawson.  The General Agreement executed on July 15, 2000, sets out the ownership interests of King and Davis, but it makes no mention of the Buy-Sell Agreement and makes no mention of the parties' intent to alter, amend, modify, or terminate the Buy-Sell Agreement.  The General Agreement further does not fully settle all rights of the parties as to ownership of the Corporation, so it cannot be found to rescind or replace the Buy-Sell Agreement.  Further, this court finds that the actions taken by the parties during the July 15, 2000, transfer were not intended to abandon the Agreement; rather, the documents executed on July 15, 2000, stated the terms of the transfer to King and detailed the resulting ownership interest in the Corporation.  The July 15, 2000, transfer was assented to by Davis, King, Scott, and Lawson.  This July 15, 2000, agreement provided that, "[t]his agreement shall be binding upon the parties, their successors, assigns and personal representatives ...."  While it operates as a waiver of any deficiencies in compliance with the original Buy-Sell Agreement, it does not evidence an abandonment of the Agreement.  Because no written amendment to the Agreement was made, and no positive and unequivocal steps were taken to abandon or rescind the Agreement, the Buy-Sell

19

Agreement remained enforceable on July 15, 2000.

While King was not an original party to the Buy-Sell Agreement, it is clear that the parties to the Agreement meant for it to be binding on all future shareholders. The Agreement specifically states that the parties contemplate that there may be additional shareholders in the future and that the Agreement is to be binding on the original parties and their successors and assigns. Therefore, this Court finds that the Agreement is valid and enforceable, and that King, as a shareholder, has the right to enforce any provisions of said Agreement.

### King is not estopped from asserting any rights under the Buy-Sell Agreement

Davis asserts that King is equitably estopped from asserting any rights, or has waived his rights. The Supreme Court of Alabama in Ford v. Jackson Square, Ltd., 548 So.2d 1007 (Ala. 1989) discussed both equitable estoppel and waiver. Quoting from Dobbs, Remedies, Section 2.3 (1973) the Supreme Court stated, "'An estoppel ... has three important elements. The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. The other relies upon the communication. And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.'" Ford, 548 So. 2d at 1013.

The facts submitted show that King was not aware of the terms of the Buy-Sell Agreement until July, 2002. Prior to that date it cannot be said that he had "knowledge of the true facts," such that his conduct could amount to an equitable estoppel. The party with "knowledge of the true facts" was Davis. The only Option Event that happened after 2002 was the death of Davis. King then asserted his rights under the terms of the Buy-Sell Agreement.

Reviewing what transpired prior to his knowledge of the Buy-Sell Agreement terms,

20

beginning with the March 10, 1995, transfer of 100 shares from Davis to Scott, nothing involved King and therefore nothing about this transaction could rise to an estoppel.

The next transaction in evidence was the issuance of shares to King and Lawson on September 19, 1995. A review of the Buy-Sell Agreement reflects no obligations on either King or Lawson. Rather, it evidences an obligation on behalf of Davis to ensure that new shareholders became parties to the Buy-Sell Agreement.

There was also evidence that Scott sold some of his shares to King and Lawson. Pursuant to the Buy-Sell Agreement, it was Scott's obligation under Article II to offer those shares first to the other shareholders and then to the corporation. As a purchaser, the Buy-Sell Agreement placed no duties upon King except to exercise his right to purchase the shares of stock.

The next transfer was the July 15, 2000, transfer when the shares were ultimately allocated with 60% to Davis and 40% to King. Again, King was the purchaser, not a seller. Article II of the Buy-Sell Agreement placed the obligation on the seller to offer the shares to the other shareholders and then the corporation. The obligation was not on the buyer, King.

Davis filed his Chapter 13 bankruptcy petition on December 4, 2000. Article I (23) defines a non-consensual transfer to include the filing of a bankruptcy petition by a shareholder. This then triggered an Option Event under Article I (24) and made Davis' shares Option Shares under Article I (25).

**ARTICLE II**
LIFETIME OPTIONS
    (1) RESTRICTIONS ON SHARES: Each shareholder hereby grants to the Optionee Shareholders and the Corporation the continuing option to purchase all his Shares that become Option Shares due to the occurrence of any Option Event, on the terms, conditions, and limitations contained herein.
    (2) FIRST OPTION: Upon the occurrence of an Option Event, the Optionee Shareholders shall have the First Option to purchase all the Option Shares at the

Purchase Price and on the terms, conditions, and limitations hereinafter stated.

(3) FIRST OPTION METHOD: The Purchasing Shareholders shall have the right to purchase the Option Shares in proportion to their ownership of the remaining Shares. Any Optionee Shareholder may exercise his option to purchase Option Shares in part or in whole, and the other Optionee Shareholders shall be authorized to purchase any Option Shares that any Optionee Shareholder elects not to purchase in proportion to their ownership of the remaining Shares.

(a) LAPSE OF FIRST OPTION: The First Option shall lapse as to all Option Shares for which the Optionee Shareholders fail to give notice of their intent to exercise the First Option within 30 days (except as otherwise provided herein) after written notice of the First Option becoming exercisable has been given by the Optionor Shareholder to the Optionee Shareholders.

(4) SECOND OPTION: If the First Option lapses as to any Option Shares, the Corporation shall have the Second Option to purchase such Option Shares upon the same terms, conditions, and limitations as apply to the First Option.

(a) LAPSE OF SECOND OPTION: If the Corporation does not give notice of its intent to exercise the Second Option, within thirty days after the lapse of the First Option, the Second Option shall lapse and no further options shall arise hereunder except as herein provided. However, if the exercise of the Second Option is mandatory in accordance with Articles III or IV below, then it shall nonetheless be deemed to have been exercised by the Corporation immediately upon the lapse of the First Option.

(6) NOTICE OF OPTIONS: The Optionor Shareholder shall give each of the Optionee Shareholders and the Corporation notice of the occurrence of an Option Event in accordance herewith reasonably in advance of same but not later than ten days after the occurrence thereof. The notice of Option Events shall describe the Option Event and the number of Shares subject to the Option Event and shall be accompanied by such information as shall be reasonable necessary for the Optionee Shareholders and the Corporation to properly evaluate the First Option and Second Option or as they may reasonable request for such purpose.

Such notice shall be deemed to have been given by the Optionor Shareholder upon the occurrence of the later of: (i) the date such notice is received by all Optionee Shareholders and the Corporation; or, (ii) the date all Optionee Shareholders and the Corporation otherwise learn of the occurrence of the Option Event.

There is no evidence that Davis gave notice to King that he had an option to purchase his shares pursuant to Article II and there was no evidence that King was aware that Davis had filed a bankruptcy petition. In addition, King did not know of the Buy-Sell Agreement terms at this time and could not be estopped by failing to exercise a right that he did not know he had.

The next thing that happened was that King was fired by Davis in February of 2002. Article

22

I (25) makes the shares of a terminated shareholder option shares. Article I (24) made the termination of employment of a shareholder an option event. Pursuant to Article II, Davis had the right to purchase King's shares as option shares. Davis clearly had knowledge of the termination since he is the one that fired King and he also had knowledge of the Buy-Sell Agreement, since he was a party to the Agreement, as well as president, secretary/treasurer and director of the corporation at all times. Article II sets out what happens in the event of termination as an option event. King received a copy of the Agreement five months later, in July, 2002.

There was no evidence that King gave Davis written notice that he had been fired by Davis, but Article II (6) provides "such notice shall be deemed to have been given by the Optionor Shareholder upon the occurrence of the later of : (i) the date such notice is received by all Optionee Shareholders and the Corporation; or, (ii) the date all Optionee Shareholders and the Corporation otherwise learn of the occurrence of the Option Event." Davis was the only Optionee Shareholder and president, secretary/treasurer and director of the corporation. He clearly had knowledge that he had just fired King. The first option was not exercised within thirty days. The second option to the corporation likewise lapses if it is not exercised by the corporation within thirty days. The president, secretary/treasurer and director of the corporation had knowledge that King had been fired.

Davis also asserts that King has waived any right to enforce the Buy-Sell Agreement. The Supreme Court in Ford also stated, "[w]aiver, on the other hand, has been defined as the 'voluntary and intentional surrender or relinquishment of a known right.'" Ford, 548 So. 2d at 1013.

King having no knowledge of his rights under the Buy-Sell Agreement, cannot be found to have "intentionally surrendered or relinquished" a known right prior to July, 2002.

23

## CONCLUSION

The parties have failed to show this court any evidence that they at any time altered, amended, modified, or rescinded the Buy-Sell Agreement. There has been no evidence presented to show that the parties attempted to amend or rescind the original Agreement during the March 10, 1995, stock transfer. Further, there has been no evidence presented to show that the parties attempted to amend or rescind the original Agreement during the September 19, 1995, stock transfer. The parties again have produced no evidence that the parties intended to amend or rescind the original Agreement during the next transfer of stock on December 31, 1998. The final transfer made on July 15, 2000, likewise has no actions by the parties that shows they intended to amend or rescind the original Agreement.

Therefore, because the parties to the Buy-Sell Agreement never took positive, unequivocal steps to alter, amend, modify, or rescind the Agreement, it remains a valid and enforceable agreement between the parties, their respective personal representatives, heirs, next of kin, legatees, distributees, successors, and assigns.

**DONE and ORDERED** this February 11, 2008.

/s/ C. Michael Stilson
C. Michael Stilson
United States Bankruptcy Judge

24